994 So.2d 200 (2008)
James Dwight VICKERS, Sr., Appellant
v.
STATE of Mississippi, Appellee.
No. 2006-KA-01711-COA.
Court of Appeals of Mississippi.
April 8, 2008.
Rehearing Denied July 22, 2008.
Certiorari Denied November 6, 2008.
*205 James Lappan, Andre De Gruy, Jackson, Leslie S. Lee, attorneys for appellant.
Office of the Attorney General by Ladonna C. Holland, attorney for appellee.
Before MYERS, P.J., GRIFFIS AND ROBERTS, JJ.
ROBERTS, J., for the Court.
¶ 1. This is an appeal from the Circuit Court of Washington County by James Dwight Vickers, Sr. (Vickers) from his conviction on five counts, which include: (1) capital murder; (2) aggravated assault; (3) conspiracy to commit capital murder; (4) a second conviction of conspiracy to commit capital murder; and (5) possession of a firearm by a convicted felon.
¶ 2. The testimony at trial revealed that Vickers repeatedly attempted to hire someone to kill his brother and sister-in-law, David and Brenda Vickers. After several unsuccessful attempts, Vickers happened upon a man identified as Jerome Booth and offered him $50,000 to murder David and Brenda. In January 2002, Booth attempted to fulfill his end of the bargain. He drove to David and Brenda's house and shot them both. David did not survive; however, Brenda recovered from her wounds after being left for dead by Booth.
¶ 3. The investigation of the attack pointed to Vickers, and he was eventually arrested in connection with the slaying. Following the trial, he was found guilty of the above named charges. From this conviction, Vickers now appeals and raises the following issues:
I. WHETHER THE EVIDENCE PRESENTED AT TRIAL WAS SUFFICIENT TO SUPPORT EACH VERDICT.
II. WHETHER THE VERDICTS WERE AGAINST THE OVERWHELMING WEIGHT OF THE EVIDENCE.
III. WHETHER THE DOUBLE JEOPARDY CLAUSE WAS VIOLATED.
IV. WHETHER THE TRIAL COURT ERRED IN NOT ALLOWING IMPEACHMENT EVIDENCE.
V. WHETHER THE TRIAL COURT ERRED IN DENYING A NEW TRIAL BASED UPON ALLEGED JUROR MISCONDUCT.
VI. WHETHER VICKERS'S ABILITY TO PRESENT A MEANINGFUL DEFENSE WAS HINDERED.
VII. WHETHER THE DOCTRINE OF CUMULATIVE ERROR WARRANTS A NEW TRIAL.
¶ 4. Finding no error, we affirm.

PROCEDURAL HISTORY
¶ 5. Vickers was indicted on August 2, 2002, in the Circuit Court of Washington County. His trial began on May 6, 2003, and ended on May 12, 2003, with the jury returning guilty verdicts on all charges. The following day, the trial court sentenced Vickers as follows: (1) life without parole in Count I; (2) twenty years in Count II, to be served consecutively to Count I; (3) twenty years in Count III, to be served consecutively to Count I, but concurrently to Count II; (4) twenty years in Count IV, to be served consecutively to Count I, but concurrently to Counts II and III; (5) and three years on Count VI, to be served consecutively to Count I, but concurrently to Counts II, III, and IV. Vickers *206 was also ordered to pay court costs. From this conviction, Vickers timely appealed.

FACTS
¶ 6. On January 12, 2002, David and Brenda were attacked in their Greenville home. The following picture of the attack emerged from Brenda's testimony. A man, whom she later identified as Booth, parked at their house and began to pick up pecans from the Vickerses' yard.[1] David stepped outside to speak to Booth. A brief moment later the pair came crashing through the door; David was in a fight for his life. Brenda then heard a gunshot and saw that David was on the floor. She attempted to activate the home's security system and retrieve a gun from the bedroom. However, Booth caught up to her and struck her in the head with his pistol. With Brenda incapacitated, Booth returned to David and shot him to death. Following David's murder, Booth dragged Brenda out of the bedroom, shot her, and left her for dead. She eventually made it to the hospital and was treated for her wounds.
¶ 7. Testimony at trial provided the circumstances which led to David's murder and Booth's presence in the yard that day. Charles Allen was the first to testify. Allen, who had known Vickers for several years, stated that he saw Vickers at a casino in Greenville, Mississippi on September 14, 2001. As they were going up an escalator, Allen told Vickers that he needed a job. According to Allen, Vickers responded, "the type of job I have, I don't think you want." Allen persisted in his request, and Vickers told him, "I want my brother and my brother's wife killed." Vickers told him to call the next morning if he was interested. Following this conversation, Allen walked to a nearby police station and told the police that Vickers propositioned him to murder David. Allen was asked by law enforcement to go along with Vickers's request.
¶ 8. Allen spoke to Vickers the next morning. Vickers explained that there was a dispute between him and his brother over two different wills of his father, Elmer Vickers, and he stood to lose $12 million if he lost in court. So, Vickers wanted his brother and brother's wife killed, and he offered Allen $50,000 to do it. However, Vickers did not have any money available at the time. So, with the aid of Allen, two days later Vickers unsuccessfully tried to sell a wave runner for part of the money. He then told Allen he was going to borrow the money from his son. Following this conversation, Allen returned to the police department. However, he was arrested for failure to pay an unrelated fine.
¶ 9. After spending a night in jail, Allen met with Vickers again. Vickers gave him $2,000, and he explained how he wanted the murders carried out. Vickers drew a diagram showing how to get to the house, where the bedroom was, where a safe was, and told Allen to make sure and get David's wallet. Allen took the money, but he did not return to the police station or have any further contact with Vickers.
¶ 10. The testimony at trial showed that Allen was not the only individual Vickers attempted to recruit. Daniel Spencer and James Woodruff also became involved. Spencer testified that he first met Vickers in March or April 2001 when he was mowing his lawn. After the two became acquainted, Vickers asked Spencer if he knew anyone that would accept a job to kill someone. Vickers later offered Spencer a *207 thousand dollars, which he paid, to help find someone who would commit the murder. Vickers drew Spencer a map of David's house and asked him to observe the property to see "if [Spencer] thought it could be done." Spencer looked at the property and expressed doubt over the potential success of the murder. Later, Vickers further explained to Spencer that he wanted David and his wife killed so there would be no one to fight him over his father's estate. He also wanted David's wallet retrieved. Nothing came of the plot.
¶ 11. Spencer then told Vickers that Woodruff might be able to help with the murders, but Woodruff needed bus fare to come from Louisiana. Vickers provided the money for Woodruff's transportation, and Woodruff came to Mississippi in August 2001. Vickers told Spencer and Woodruff to kill David and Brenda and make it look like a robbery. Again, he specifically told them to retrieve David's wallet. Vickers also instructed them to say Brenda hired them to kill David if they were caught. Spencer further testified that throughout their arrangements Vickers provided three handguns to carry out the murders. The first was a .22 caliber target pistol. The second was a .38 caliber pistol. The final pistol was a 9mm.
¶ 12. In mid-September 2001, Spencer and Woodruff went to David's home to carry out the murders. However, Spencer testified that after forty minutes of stalking around the grounds of David's house, they could not go through with it. They returned to Vickers, who was waiting on a report. They told him it was too well lit on the property to proceed, and there was a nearby neighbor who would have seen them.
¶ 13. According to Spencer, after their abandoned attempt, Woodruff returned to Louisiana in a vehicle provided by Vickers. Vickers later sent Spencer to Louisiana to check on Woodruff. Spencer testified that Vickers continually tried to come up with a way to complete the murders, and at some point, he told Spencer that "he had a black guy to do it." The individual would later be identified as Booth. After Woodruff's return to Mississippi at the behest of Vickers, he asked Spencer and Woodruff to get a car for the assassin to use. Additionally, Vickers wanted the pair to kill Booth after the deed was done. Vickers told Spencer he was going to pay Booth $50,000 for the murders. He offered Spencer $150,000 in cash and a $100,000 house for his assistance in the new plan. In actuality, throughout his involvement, Spencer was paid a total of $3,000 to $4,000. Vickers told Spencer he would get the rest once David and Brenda were dead and the estate was settled.
¶ 14. At Vickers's request, Spencer did obtain a late model car for Booth to use. He left it close to Booth's residence and placed a loaded 9mm pistol in it that he obtained from Vickers. On January 12, 2002, Vickers called Woodruff's cell phone and told him and Spencer to wait in town. Vickers told them that Booth picked up the car and went to David's house. He and Woodruff passed by David's house and saw the car in the driveway. They also saw Booth picking up pecans in the yard. At this point, Spencer and Woodruff "freaked out" because they realized David and his wife were about to be killed. Spencer testified that he did not take Vickers seriously until that morning. During cross-examination, he testified that he never planned to kill anyone.
¶ 15. After the murder, Booth abandoned the car at a grocery store because it had a flat tire. Vickers called Woodruff's cell phone and told Woodruff and Spencer that Booth was walking down Main Street, and he was going to pick Booth up. *208 Spencer and Woodruff drove to Main Street and saw Vickers picking up Booth. Vickers called again and told them that Booth had recovered his own vehicle and was coming back to the abandoned car to recover the pecans and pistol. Spencer and Woodruff waited across from the parking lot and saw Booth get out of his truck, retrieve the items, and then get back in the truck. Vickers later told Spencer that Booth threw the 9mm pistol in a ditch alongside Main Street.
¶ 16. After his arrest, Spencer identified Booth from a photograph array as the man Vickers had hired. He testified that he and Woodruff never planned to kill Booth. When they told Vickers they were unsuccessful, Vickers told Spencer that he paid Booth $2,000 for the killing so Booth could leave Mississippi.
¶ 17. Woodruff also testified at Vickers's trial. He testified that once in Mississippi, he met with Vickers. Vickers told him to take his friend's truck and go kill David and David's wife. Similar to Spencer's testimony, Woodruff stated that Vickers told him if he was caught to say that Brenda planned the murder. He took the truck and the .22 caliber pistol to David's house. However, he testified that he could not do it. He said he thought he could, but he realized that he could not.
¶ 18. He made one more attempt to go through with the plan and parked in David's driveway while contemplating his next move. David came out of the house and asked what he was doing in the driveway. Woodruff claimed he needed help and asked to use the telephone. David declined his request, and Woodruff left. After the abandoned attempt, Woodruff went back to Louisiana using one of Vickers's cars.
¶ 19. While in Louisiana, Woodruff wrecked Vickers's car. Spencer came to Louisiana, in a vehicle rented by Vickers, to see the condition of the car. Woodruff did not return with Spencer at this point, but he did return later. After his return, Vickers came up with another plan. Woodruff was to present himself as a landscaper in need of hay from David's land. Woodruff set up a meeting with David to buy some hay. He arrived at his home with the .38 caliber pistol, but David was not there. When Woodruff walked up the driveway, Brenda asked if he was there to meet with David. He said "yes" and asked if he could use the telephone. Brenda initially allowed him to use the telephone, but sensing something amiss, she asked him to leave the house. When he did not leave immediately, she fled. After Woodruff left David's house, he told Spencer he no longer wanted to be a part of the murders. Woodruff testified that Spencer concurred.
¶ 20. Later, in January 2002, Vickers approached Woodruff and Spencer with another plan. Booth was to pick up pecans in David's yard and then kill him and Brenda. After the murders, they were supposed to meet Booth under the guise that they would pay him $50,000, but instead they would kill him.
¶ 21. His account of the day of the murder was substantially similar to Spencer's. However, he testified that he and Spencer's girlfriend went by David's house to see if Booth was out there. When they drove by, they saw a black male in the yard picking up pecans. This was the first time he saw Booth. He called Vickers and Spencer and told them that Booth was in the yard. Woodruff testified that Vickers called him and told him that Booth could not go through with the murders. However, Vickers called again a few minutes later and told them that Booth was going to try to complete the plan. Vickers called about twenty minutes later and told them that Booth had murdered David and Brenda. *209 Vickers stated that Booth had a flat tire and was walking down the street. He told Woodruff and Spencer to go get the car, and he would pick up Booth. They drove down Main Street and saw Booth getting into Vickers's truck.
¶ 22. Woodruff then went to the abandoned car in the grocery store parking lot. He looked in the window and saw a bucket of pecans and the 9mm pistol. Vickers called and told them that Booth was coming back to pick the items up. Spencer and Woodruff parked across from the grocery store and saw Booth pull up in his truck. Booth retrieved the pecans and gun, and he drove off.
¶ 23. Woodruff testified that approximately a day after the murders, Vickers asked them to move the car used by Booth. They replaced the flat tire and intended on driving the car out into the country. However, Woodruff wrecked the car and left it parked by a field. Before they left it, they blew out three tires and removed the newly replaced tire. Shortly after this, Woodruff returned to Louisiana and was arrested for an unrelated probation violation.
¶ 24. Lieutenant Kelvin McKenzie, an investigator with the Washington County Sheriff's Department, testified as to his involvement in the investigation. He testified that Vickers's home telephone records revealed that he had made several calls to Mid-Delta Cold Storage prior to the murder. He stated that was where Booth was working at the time of the murder. There were also calls to and from Booth's home telephone to Vickers.
¶ 25. In a search of Vickers's home, he found a note pad that had Spencer's and Woodruff's names on it. Also, he found a can of oil in the trash. Inside the can there was an object wrapped with several feet of packing tape. After unwrapping the object, he discovered that it was a black tri-fold wallet with the interior pockets torn out of it. As a result of his investigation of the murder, he determined the wallet was David's. Lastly, he testified that the .22 caliber and .38 caliber handguns were recovered from Lorie Poag's residence. She was Vickers's girlfriend at the time of the murder. Both guns were legally owned by Poag.
¶ 26. Doris Hancock also testified during Vickers's trial. She worked for Vickers's Towing Company for thirty-eight years, and she knew David and Vickers well. Hancock identified the wallet retrieved from Vickers's trash as one that she gave David as a Christmas present in 2000. She explained that in July 2000 she witnessed an argument between David and Vickers in which Vickers threatened to kill David. On cross-examination, she stated that Vickers was upset about David filing a petition to place their father, Elmer Vickers, under a conservatorship.
¶ 27. Claude Tollfree testified that he was David and Brenda's neighbor. The day of the murder, he saw a blue car sit in David's driveway for about an hour and then leave. He noticed a black male driving the car. He stated that the car returned soon after it left the first time. The driver parked the car and went in the house. The man got back in the car thirty or forty minutes later and left. Tollfree testified that when he drove by his house the second time he was able to get a good look at him. He stated that about thirty or forty minutes after the driver left he saw Brenda come out of the house. Soon after, the police arrived at the home. During the investigation, Tollfree identified Booth as the driver from a photograph array.
¶ 28. Curtis Garrette, a probation officer with the U.S. District Court of the Northern District of Mississippi, was also *210 called to the stand. He testified that Vickers was previously convicted of felony wire fraud in Montana, and he was Vickers's parole officer. He stated that he had a meeting with Vickers on October 25, 2001. The meeting was set so that he could sign over a portion of his claim to his father's estate to pay restitution in the amount of $590,000 to the federal court in Montana. Garrette testified that Vickers was upset at the meeting, and Vickers said that he was going to kill his brother.
¶ 29. Finally, Vickers exercised his constitutional right and chose not to testify at his trial. Additional facts will be discussed below, as needed.

ANALYSIS

I. WHETHER THE EVIDENCE PRESENTED AT TRIAL WAS SUFFICIENT TO SUPPORT EACH VERDICT.
¶ 30. Vickers was found guilty of Counts I, II, III, IV, and VI. He argues that the trial court erred in denying his motions for directed verdict and judgment notwithstanding the verdict (JNOV). Such motions challenge the sufficiency of the evidence. When reviewing a case for sufficiency of the evidence, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Bush v. State, 895 So.2d 836, 843(¶ 16) (Miss.2005) (quoting Jackson v. Virginia, 443 U.S. 307, 315, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)). "The credible evidence which is consistent with the verdict must be accepted as true." James v. State, 481 So.2d 805, 810 (Miss. 1985). The evidence must show "beyond a reasonable doubt that [the] accused committed the act charged, and that he did so under such circumstances that every element of the offense existed; and where the evidence fails to meet this test it is insufficient to support a conviction." Bush, 895 So.2d at 843(¶ 16) (quoting Carr v. State, 208 So.2d 886, 889 (Miss.1968)). Keeping in mind the reasonable doubt standard, if "reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions on every element of the offense," the evidence will be deemed to have been sufficient. Id. (quoting Edwards v. State, 469 So.2d 68, 70 (Miss. 1985)).

A. COUNT I
¶ 31. Count I charged Vickers as follows:
That JAMES DWIGHT VICKERS, SR. and JEROME BOOTH, a/k/a Robert Baker, each acting in concert with the other, on [the] 12th [d]ay of January, 2002, in Washington County, and within the jurisdiction of the Court, unlawfully, willfully, feloniously, and without authority of law and of their malice aforethought and with deliberate design to effect death, did, then and there, kill and murder one David Vickers, a human being, at a time when JEROME BOOTH, had been offered money by JAMES DWIGHT VICKERS, SR. for committing the murder, in violation of Section 97-3-19(2)(d) of the Mississippi Code of 1972, as annotated and amended.
...
¶ 32. Mississippi Code Annotated section 97-3-19(2)(d) (Rev.2006) states that:
(2) [t]he killing of a human being without the authority of law by any means or in any manner shall be capital murder in the following cases: ... (d) Murder which is perpetuated by any person who has been offered or has received anything of value for committing the murder, and all parties to such murder, are guilty as principals....
*211 Vickers argues that the State failed to meet its burden as there was no direct evidence proving that anything of value was offered or exchanged from Vickers to Booth for the killing of David. Upon our review of the record, we must disagree.
¶ 33. Woodruff and Spencer testified that after their failed attempts to murder David and Brenda in exchange for money, Vickers contacted them and told them that he found someone else to complete the job. They later discovered that this new assassin was Booth. Woodruff and Spencer also testified, without contradiction, that Vickers told them that he told Booth he would pay him $50,000 for killing his brother and sister-in-law. On January 12, 2002, Spencer and Woodruff saw Booth, whom they would later identify from a photograph array, picking up pecans in David's front yard according to Vickers's plan. After the murder of David and the assault on Brenda, the late model car used in the attacks had a flat tire, and Booth was forced to stop. As Booth walked down Main Street, presumably back to his own vehicle, Spencer and Woodruff saw Booth get in Vickers's truck. As it turned out, Vickers drove Booth to his vehicle. After receiving a call from Vickers informing Spencer and Woodruff that Booth was on his way back to the late model car used in the murder, the pair parked across the street from the car and saw Booth retrieve the pecans he picked up from David's yard and weapon he used in the murder. Additionally, Spencer testified that Vickers told him that he paid Booth $2,000 for the murders and to leave Mississippi. Tollfree and Brenda also identified Booth from a photograph array.
¶ 34. During the investigation of the murder and assault, Steve Chancellor, a senior forensic analyst with the Mississippi State Crime Lab, had an opportunity to observe and analyze the crime scene. He testified that there were several 9mm rounds and shells found in the house. Additionally, he found a .38 caliber pistol and live .38 caliber round. He further stated that the bullet that shot Brenda was also a 9mm.
¶ 35. Robert Warbington, a Mid-Delta Cold Storage employee, testified that he and Booth worked for Mid-Delta in January 2002. He explained that Vickers had no business relationship with Mid-Delta, but on January 3, 2002, Mid-Delta received three calls from Vickers. He testified that Booth was working that day.
¶ 36. Viewing all evidence in a light most favorable to the prosecution, we find that it was legally sufficient to support the jury's verdict of guilt. This issue is without merit.

B. COUNT II
¶ 37. Count II charged Vickers with the aggravated assault of Brenda while working in concert with Booth, who "[shot] [Brenda] with a deadly weapon, to-wit: a pistol" in violation of Mississippi Code Annotated section 97-3-7(2)(b) (Rev. 2006). As with his argument above under Count I, Vickers claims the evidence presented at trial was insufficient to prove he hired Booth. However, as discussed above, the evidence presented to the jury was more than sufficient to prove that Booth committed the assassination of David, as well as the aggravated assault of Brenda while in the employ of Vickers. This issue is without merit.

C. COUNT III
¶ 38. Count III charged Vickers with conspiring with Spencer from July 2001 to January 2002 by offering money to murder David and Brenda in violation of Mississippi Code Annotated sections 97-1-1 and 97-3-19(2)(d) (Rev.2006). Vickers argues that Spencer testified that he never *212 planned on actually murdering David and Brenda. Therefore, no conspiracy could have existed between Vickers and Spencer.
¶ 39. Section 97-1-1 makes it unlawful for "two (2) or more persons [to] conspire ... [t]o commit a crime." Miss. Code Ann. § 97-1-1(1)(a) (Rev.2006). Conspiracy has been further defined as the "combination of two or more persons to accomplish an unlawful purpose or to accomplish a lawful purpose unlawfully, the persons agreeing in order to form the conspiracy. The offense is complete without showing an overt act in furtherance of the conspiracy." Brown v. State, 796 So.2d 223, 225-26(¶ 9) (Miss.2001) (quoting Peoples v. State, 501 So.2d 424, 428 (Miss. 1987)). The crime of conspiracy is complete upon formation of the agreement. State v. Thomas, 645 So.2d 931, 933 (Miss. 1994). "The agreement need not be formal or express, but may be inferred from the circumstances, particularly by declarations, acts and conduct of the alleged conspirators." Brown, 796 So.2d at 226(¶ 10) (quoting Barnes v. State, 493 So.2d 313, 315 (Miss.1986)).
¶ 40. Spencer did testify that he never planned on killing anyone, and as Vickers argues, there must have been an agreement between Vickers and Spencer "to accomplish an unlawful purpose." However, contrary to his stated intention, Spencer also testified as to his involvement in the attempts on David's and Brenda's lives. The supreme court has held that:
jurors are permitted, indeed have the duty, to resolve the conflicts in testimony they hear. They may believe or disbelieve, accept or reject the utterances of any witness ... A reviewing court cannot and need not determine with exactitude which witness or what testimony the jury believed or disbelieved in arriving at its verdict. Also ... this Court [has] stated that in a criminal prosecution, the jury may accept the testimony of some witnesses and reject that of others, and may accept in part and reject in part the testimony of any witnesses, or may believe part of the evidence on behalf of the state and part of that for the accused, and the credibility of such witnesses is not for the reviewing court, but only for the jury.
Brown, 796 So.2d at 227(¶ 12) (internal citations omitted).
¶ 41. Spencer testified that he scouted David and Brenda's property, arranged the meeting between Woodruff and Vickers, and participated with Woodruff in an attempt to murder David and Brenda. Given his actions in furtherance of the conspiracy, it was fully within the jury's discretion to discount Spencer's testimony that he did not intend to go through with the murders. As the verdict returned on this count was "guilty," we can only assume the jury did just that. As a reviewing court, we may not question a jury's determination of what testimony to believe and what testimony not to believe. Therefore, viewing the evidence in a light most favorable to the prosecution, we find this issue to be without merit.

D. COUNT IV
¶ 42. Count IV was identical to Count III in all respects save that it alleged Vickers also conspired with Woodruff. Vickers makes a similar argument as he did under Count III above. Specifically, Vickers argues that the evidence presented at trial was insufficient to prove a conspiracy existed between him and Woodruff. Vickers claims that the jury's guilty verdict on Count IV cannot stand because "Woodruff testified that it was not in his nature to kill anyone [and] ... could not follow through with it."
*213 ¶ 43. As discussed above, the crime of conspiracy is the agreement of two or more persons to commit an unlawful act. Brown, 796 So.2d at 225-26(¶ 9). The crime is complete when the agreement is formed. Thomas, 645 So.2d at 933. There is no indication in the record that Woodruff was not completely prepared to follow through with the murders of David and Brenda. That his moral compass steered him away from completing the acts is of no consequence to the crime of conspiracy. Viewing the evidence previously discussed in a light most favorable to the prosecution, we find this issue without merit. Vickers was guilty of conspiracy the moment he and Woodruff came to a clandestine understanding regarding the murder of his brother and sister-in-law.

E. COUNT VI
¶ 44. Count VI charged Vickers with possession of a firearm by a convicted felon between the dates of July 2001 and January 2002, in violation of Mississippi Code Annotated section 97-37-5 (Rev. 2006). Vickers argues that the trial court erred in failing to grant his motions for directed verdict or JNOV because: (1) there was no testimony corroborating Woodruff's and Spencer's testimonies that Vickers possessed the pistols; (2) jury instruction number twenty-two allowed the jury to find Vickers guilty if they found he possessed a .38 caliber pistol, or a .22 caliber pistol, or a 9mm pistol, and there is no way to tell if the jury unanimously found Vickers guilty for possessing any one of the pistols; and (3) the State's jury instruction did not specify the actual date(s) Vickers possessed a firearm.

(1). WHETHER THE EVIDENCE PRESENTED AGAINST VICKERS WAS SUFFICIENT.
¶ 45. Mississippi Code Annotated section 97-37-5 states that "[i]t shall be unlawful for any person who has been convicted of a felony under the laws of this state, any other state, or of the United States to possess any firearm...." Miss. Code Ann. § 97-37-5(1) (Rev.2006). It was uncontradicted at trial that Vickers had been previously convicted of a felony. Spencer and Woodruff testified that Vickers was in possession of no less than three pistols. This Court has stated that the testimony of even one witness is enough for the jury to find guilt. Deloach v. State, 811 So.2d 454, 456(¶ 9) (Miss.Ct.App.2001). As noted above, it was for the jury to decide whether to believe or disbelieve the testimony of Spencer and Woodruff. Therefore, as to Vickers first point of error concerning Count VI, we find testimony of Spencer and Woodruff was legally sufficient to support the jury's verdict of guilt. This issue is without merit.

(2). WHETHER JURY INSTRUCTION TWENTY-TWO WAS SUFFICIENT.
¶ 46. Jury Instruction twenty-two stated as follows: "To convict Mr. Vickers [of] unlawful possession of a pistol, you must unanimously agree that Mr. Vickers possessed a .38 cal[iber] pistol[,] or a .22 caliber pistol[,] or a 9mm pistol." Vickers argues that the wording of jury instruction twenty-two, which was defense instruction forty-eight, allowed the jury to find him guilty of possession of a firearm by a felon without unanimously agreeing he possessed a specific pistol.
¶ 47. Notwithstanding the fact that Vickers now argues against the sufficiency of his own instruction, it has been consistently held that when reviewing the adequacy of jury instructions they are to be read and considered as a whole. Wilcher v. State, 863 So.2d 719, 751 (¶ 116) (Miss. 2003); Conley v. State, 790 So.2d 773, *214 796(¶ 85) (Miss.2001); Henderson v. State, 660 So.2d 220, 222 (Miss.1995). The trial court also granted defense instruction forty-nine, which stated, "To convict Mr. Vickers of unlawful possession of a pistol you must also unanimously determine that the pistol you have unanimously determined he was in possession of was capable of being fired." (Emphasis added). When read together, it is clear that for the jury to find him guilty of Count VI, they must have all agreed on a specific pistol he was in possession of. We find no error in the jury instructions as given. This issue is without merit.

(3). WHETHER SPECIFIC DATES WERE REQUIRED IN THE JURY INSTRUCTION.
¶ 48. In Vickers's last argument concerning Count VI, he claims that:
[b]ecause the State could not specify [in the jury instructions] with any detail the dates Vickers was supposed to have possessed these weapons, and the total lack of corroborating evidence by the two accomplices, the trial judge should have granted trial counsel's motion for directed verdict or at least granted his motion for judgment notwithstanding the verdict on this count as well.
However, Vickers fails to cite any authority for the proposition that the failure to provide in a jury instruction a specific date a prior convicted felon possessed a firearm affects the weight or sufficiency of the charge. Therefore, his claim is procedurally barred. Glasper v. State, 914 So.2d 708, 726(¶ 40) (Miss.2005).
¶ 49. Notwithstanding the procedural bar, we find no error. While it "would be no great task to include the date(s) established by the evidence" in a jury instruction, Vickers "has raised no credible claim of unfair surprise or prejudice" stemming from the jury instruction as given. Wilson v. State, 515 So.2d 1181, 1183 (Miss.1987). This issue is without merit.

II. WHETHER THE VERDICTS WERE AGAINST THE OVERWHELMING WEIGHT OF THE EVIDENCE.
¶ 50. This Court's standard of review when determining whether a jury verdict is against the overwhelming weight of the evidence is well settled. A defendant is not entitled to a new trial "unless [we are] convinced that the verdict is so contrary to the overwhelming weight of the evidence that, to allow it to stand, would be to sanction an unconscionable injustice." McLendon v. State, 945 So.2d 372, 385(¶ 40) (Miss.2006) (citation omitted). Additionally, all evidence should be viewed in a light most favorable to the verdict. Jones v. State, 962 So.2d 1263, 1277(¶ 54) (Miss.2007).
¶ 51. Viewing the evidence discussed above in a light most favorable to the verdict, we cannot say that to allow it to stand would sanction an unconscionable injustice. This issue is without merit.

III. WHETHER THE DOUBLE JEOPARDY CLAUSE WAS VIOLATED.
¶ 52. Vickers argues that the State should not have been able to prosecute him for Count I, capital murder under Mississippi Code Annotated section 97-3-19(2)(d), while at the same time prosecute him for Counts III and IV, conspiracy to commit capital murder. He claims that the capital murder charge encompassed the crime of conspiracy, and to allow conviction for both crimes violated the double jeopardy clause. In support of this assertion, Vickers cites Stewart v. State, 662 So.2d 552 (Miss.1995). Further, Vickers submits that he is entitled to a new trial as a result of the inclusion of the conspiracy charges in the presentation to the jury. *215 He claims, "[t]he jury may have concluded a conspiracy existed, but that there was insufficient evidence that Vickers hired Booth to complete the job."
¶ 53. The "same-elements" test prescribed in Blockburger v. United States, 284 U.S. 299, 304, 52 S.Ct. 180, 76 L.Ed. 306 (1932) is used to determine whether the protections against double-jeopardy apply. Graves v. State, 969 So.2d 845, 847(¶ 8) (Miss.2007). Application of the "same-elements" test requires us to review each offense and determine whether "each contains an element not present in the other; if not, they are labeled the same offense for double-jeopardy purposes, and successive prosecutions and/or punishments are constitutionally barred." Id. The Blockburger court stated that "[t]he applicable rule is that where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." Blockburger, 284 U.S. at 304, 52 S.Ct. 180. The Supreme Court further stated, "[a] single act may be an offense against two statutes; and if each statute requires proof of an additional fact which the other does not, an acquittal or conviction under either statute does not exempt the defendant from prosecution and punishment under the other." Id.
¶ 54. In Stewart, the supreme court applied the Blockburger test to the facts before it. Stewart was paid $15,000 by Ricky Selders to murder Roderick Ball. Stewart, 662 So.2d at 557. He was subsequently charged and found guilty of both conspiring with Selders to murder Ball, as well as being offered money from Selders to complete the murder. Id. at 560. The supreme court noted that while conspiracy is normally a distinct and separate offense from the underlying substantive offense, there are times when the two crimes are merged. Id. at 561. Finding such an instance in Stewart, the supreme court held "that once the State has proven murder under [section 97-3-19(2)(d)], no other evidence must be produced in order to establish the crime of conspiracy. Conspiracy to commit murder-for-hire is completely enveloped by our definition of murder-for-hire found in § 97-3-19(2)(d) of the capital murder statute." Id.
¶ 55. The case at hand is distinguishable. The vantage point in Stewart was from the point of view of a single gunman, who was a contractor's lone, successful attempt to hire a murderer. However, in this case, we are focused on the viability of convictions of murder-for-hire and conspiracy to commit murder-for-hire from the point of view of a contractor who had multiple unsuccessful attempts prior to employing Booth. The Stewart court stated that "[i]n order to elevate Stewart's charge to capital murder, the State was required to show that Stewart had been offered or had received money for the murder of Ball." Id. Under the facts of Stewart, this one showing by the State also satisfied the elements of conspiracy. Similarly, in order to elevate Vickers's charge of capital murder, the State was required to show that Booth committed the murder and that Booth had been offered or received something of value from Vickers. However, unlike the facts in Stewart, in order for the jury to find Vickers guilty of separate conspiracies with Spencer and Woodruff, the State was required to prove additional facts.
¶ 56. The State was required to show that Vickers offered Spencer and Woodruff money to murder David and Brenda, which was independent of their new agreement with Vickers that included assisting in the preparations for Booth. The testimony *216 showed that Vickers first approached Spencer with his plan to kill David and Brenda. Vickers offered and paid Spencer money in order to find another individual to assist in the planned murders. Spencer enlisted the aid of Woodruff, and Vickers paid for Woodruff's transportation from Louisiana. Once Woodruff arrived in Greenville, Vickers offered him money to kill David and Brenda. Subsequently, Woodruff and Spencer attempted to complete their end of the bargain on multiple occasions. All attempts were unsuccessful as the pair of would-be assassins could not find it in them to murder two individuals in cold blood. At this point, Woodruff returned to Louisiana, and Vickers told them that he would find someone else to murder David and Brenda. However, the testimony showed that he did keep in touch with Woodruff and Spencer.
¶ 57. Vickers later called and told them that he had found someone else that was willing to go through with the murders; however, he needed their help. He offered Spencer and Woodruff $150,000 in cash and a $100,000 house for their assistance, which represented a different amount that was substantially more than their previous agreement.
¶ 58. Based on the facts of the case before us, we find that convictions stemming from Counts I, III, and IV do not violate the double jeopardy clause. Therefore, this issue is without merit.

IV. WHETHER THE TRIAL COURT ERRED IN NOT ALLOWING IMPEACHMENT EVIDENCE.
¶ 59. During the trial, Vickers's trial counsel attempted to impeach Allen with proof of a 1977 conviction for burglary, as well as proof of fourteen other arrests. The trial court denied the request as to the 1977 conviction pursuant to Mississippi Rule of Evidence 609(b). Vickers's trial counsel argued that the conviction and arrests were probative because they showed that Allen had worked as an informant for the State for several years. The trial court held that the probative value of disclosure of the conviction was not supported by specific facts. Further, the trial court stated: "the prejudicial effect outweighs any probative value at all. So[,] I'm not letting that in." Similarly, the trial court denied Vickers's trial counsel's request to mention the arrests without a showing of bias or other foundation for the question.
¶ 60. Vickers argues that the trial court erred in ruling that defense counsel could not question Allen on his 1977 conviction or alleged arrests. He claims that any prejudice resulting from impeachment of a non-party was irrelevant, and this should not have precluded inquiry into the conviction and arrests under Mississippi Rule of Evidence 609(a)(1). Vickers cites White v. State, 785 So.2d 1059 (Miss.2001) in support of his claim of error.
¶ 61. Mississippi Rule of Evidence 609(a)(1) allows impeachment of a non-party witness by evidence of a crime punishable by imprisonment of more than one year. The supreme court has held that in all but extreme situations, which are not present in this case, non-party witnesses for the State may be impeached under Rule 609(a)(1) without balancing the probative value of the evidence with its prejudicial effect. White, 785 So.2d at 1062(¶ 10).
¶ 62. In White, Robert Shedd was the State's chief witness in its case against White. Id. at 1063(¶ 12). Over the course of two and one-half weeks and three transactions, Shedd purchased varying amounts of crystal methamphetamine from White while working as an informant for law enforcement. Id. at 1060(¶ 2). Following his purchases from White, but before testifying *217 against White, Shedd was convicted in Texas of an unrelated drug violation, also including crystal methamphetamine. Id. at (¶ 3). The trial court did not allow White to impeach Shedd with the Texas conviction. Id. at 1061(¶ 5). The supreme court held that the trial court erred in denying White's attempt to impeach the State's chief witness. Id. at 1063(¶ 12).
¶ 63. The case before us is distinguishable from White. First, Allen was far from the State's chief witness. While Allen testified as to another attempt by Vickers to hire someone to murder his brother and sister-in-law, his testimony did not directly contribute to the validity or doubt of any of the State's charges against Vickers.
¶ 64. Second, Allen's burglary conviction was twenty-six years old at the time Vickers sought to use it for impeachment. Mississippi Rule of Evidence 609(b) excludes the use of evidence of a conviction for impeachment purposes if the conviction is greater than ten years old. Evidence of such a conviction should not be admitted unless the trial court determines "that the probative value of the conviction is supported by ... specific facts and circumstances [which] substantially [outweigh] its prejudicial effect." M.R.E. 609(b). However, the proponent of using the antiquated conviction for impeachment purposes must first demonstrate the probative value of the conviction "by showing how the [conviction] suggests the witness is less than credible." Fuller v. State, 910 So.2d 674, 680(¶ 14) (Miss.Ct.App.2005) (citing Jones v. State, 702 So.2d 419, 421(¶ 13) (Miss.1997)). Failing such a showing by the proponent, a trial court's ruling to exclude evidence of a stale conviction will be upheld. Jones v. State, 776 So.2d 643, 651(¶ 28) (Miss.2000).
¶ 65. When asked by the trial court why evidence of the conviction should be admitted, defense counsel stated "because it goes to [Allen's] credibility ... [and] shows his reason for testifying on behalf of the State, that he is working for the State as an informant and has been for a number of years." As correctly identified by the trial court, evidence of the twenty-six year-old conviction was not probative of Allen's credibility or an unfounded assertion that he was working as an informant for law enforcement. In fact, there was no evidence presented whatsoever that supported defense counsel's allegation that Allen was an informant. Accordingly, Vickers failed to make a prima facie showing of the probative value of the burglary conviction. Therefore, the trial court did not err in excluding it.
¶ 66. Vickers also claims that the trial court erred in denying his request to impeach Allen through the use of fourteen alleged arrests; none of which resulted in a conviction. In his brief to this Court, Vickers states, "[u]nder M.R.E. 616, [he] should also have been allowed to cite the many times Allen received favorable treatment by the police. Although he was arrested on numerous occasions, he was apparently never prosecuted." In support of this argument, Vickers cites Zoerner v. State, 725 So.2d 811 (Miss.1998).
¶ 67. In Zoerner, a key witness for the State pleaded guilty to three unrelated counts of burglary. Zoerner, 725 So.2d at 813(¶ 3). The witness gave a statement to the police while he was awaiting sentencing, and he was subsequently sentenced to probation. Id. at 813-14 (¶¶ 4, 8). The trial court excluded the prior convictions from consideration based on Mississippi Rule of Evidence 609. Id. at 813(¶ 5). On appeal, the supreme court reversed the trial court's ruling stating, the "[e]vidence that a material witness has received favored treatment at the hands of law enforcement authorities, particularly where *218 that witness is himself subject to prosecution, is probative of the witness'[s] interest or bias and may be developed though cross-examination or otherwise presented to the jury." Id. at 814(¶ 11) (quoting Suan v. State, 511 So.2d 144, 147-48 (Miss. 1987)).
¶ 68. As stated above, Allen was far from a key or material witness. Additionally, there is nothing in the record showing what the arrests were for, their disposition, or even proof that the arrests occurred at all. Furthermore, assuming that the arrests mentioned by defense counsel were accurate, that fact alone is neither evidence of favorable treatment by law enforcement, nor bias. There was no evidence presented that would even insinuate that Allen ever received favorable treatment at the hands of law enforcement. In fact, Allen's testimony shows that the second time he attempted to inform the police of Vickers's plot to kill his brother and sister-in-law he was arrested on an unrelated matter. Such can hardly be seen as favorable treatment.
¶ 69. The trial court's decision to prohibit the defense's attempt to impeach Allen with a twenty-six-year-old burglary conviction and attempt to show bias with evidence of fourteen alleged arrests was not made in error. This issue is without merit.

V. WHETHER THE TRIAL COURT ERRED IN DENYING A NEW TRIAL BASED UPON ALLEGED JUROR MISCONDUCT.
¶ 70. In his motion for a new trial, Vickers alleged juror misconduct. The trial court reserved its ruling on the issue, and upon a motion by the State, re-opened the hearing in order to take additional testimony on the issue. Following the closed hearing, the trial court denied Vickers's motion for a new trial. Vickers now challenges this holding, arguing that had the jurors answered truthfully during voir dire proper challenges could have been made against them. Vickers notes that his trial counsel did not use all available peremptory challenges.
¶ 71. During the closed hearing, there was testimony from each of the three jurors Vickers alleged were not completely forthright during voir dire. Juror Smith, a youth service counselor, testified that she responded "no" to question twenty-six, which asked, "Have you[,] or any member of your family[,] or a close friend ever been the victim of a violent crime?"[2] However, in response to question twenty-seven on the jury questionnaire form she indicated that she had filed a complaint against someone before. Her explanation on the jury questionnaire form of the origin of the complaint was a "juvenile who assaulted [her] by hitting [her] with a coffee pot filled with ice and water while in [youth court]." Additionally, during voir dire, defense counsel asked the following question:
Now, is there anybody who because of some personal experience, either violent crime to them or to a close family member [sic]. I know that if I ask anybody who had been a crime victim or a close person to them, every hand would go up, and that's a sad thing with our society today. But we know that. I'm just talking about serious violent crime, any violent crime. Is there anybody here who is a victim of a violent crime or has a close family member or friend who is a victim of a violent crime?"
*219 Juror Smith did not respond to this question. During the post-trial hearing, she testified that she considered the incident in youth court to be a violent crime. However, she interpreted question twenty-six and defense counsel's question during voir dire as asking of serious violent crimes such as "first degree murder, arson, or some incident such as that." Notwithstanding her responses, she testified that her verdict in Vickers's case was based solely upon the law as instructed by the trial court and the evidence and testimony presented at trial.
¶ 72. Juror Wilson also testified at the closed hearing. Question twenty of the jury questionnaire asked if he had ever appeared as a witness in a criminal prosecution. His response on the questionnaire was "yes." The follow-up question was, "On behalf of the State?" Juror Wilson again responded "yes." At the post-trial hearing, he testified that he was a witness in an embezzlement case in the mid-1990s. Two prosecutors in that case were also prosecutors in Vickers's trial. However, during voir dire the trial court asked, "All right. We have the State of Mississippi, Frank Carlton, Tucker Gore, and Gaines Dyer. Does anyone have a professional, business, [or] social relationship with any of these gentlemen that would influence you in this matter?" In response to a request for clarification from a juror, the trial court stated, "if you know them[,] or if you are friends with them[,] or associates with them." Juror Wilson did not respond to the trial court's questions. He testified that he did not have a professional, business, or personal relationship with any of the prosecutors. Additionally, he explained that his understanding was that the trial court was asking if his knowledge of the prosecutors would influence his decision in Vickers's trial. Finally, as with Juror Smith, he testified that his verdict in Vickers's case was based solely upon the law as instructed by the trial court and the evidence and testimony presented at trial.
¶ 73. The final juror accused of misconduct was Juror Brown. During voir dire, the jurors were asked if they knew any of the potential witnesses in the case. The witnesses were referred to by name. Juror Brown did not recognize any of the names and did not respond to the question. When Allen took the stand to testify, Juror Brown recognized him, but he did not bring it to the attention of the trial court. He testified at the post-trial hearing that he recognized Allen because Allen was a dorm director for a year while Juror Brown was in school. Also, he had seen Allen selling fish in Greenville. Juror Brown testified that Allen was not a friend. He further testified that the extent of any conversations they would have had would have been nothing more than a cordial greeting.
¶ 74. When allegations of juror misconduct arise from a juror's failure to respond to questioning during voir dire, it falls upon the trial court to "determine whether the question propounded to the juror was (1) relevant to the voir dire examination; (2) whether it was unambiguous; and (3) whether the juror had substantial knowledge of the information sought to be elicited." Odom v. State, 355 So.2d 1381, 1383 (Miss.1978). If the trial court answers these questions in the affirmative, "the court should then determine if prejudice to the defendant in selecting the jury reasonably could be inferred from the juror's failure to respond." Id. A new trial should be ordered if prejudice could reasonably be inferred. Id. "It is, of course, a judicial question as to whether a jury is fair and impartial and the court's judgment will not be disturbed unless it appears clearly that it is wrong." Id. Lastly, each instance of alleged juror misconduct should be decided on a case-by-case basis. *220 Williams v. State, 923 So.2d 990, 997(¶ 25) (Miss.2006) (citing Odom, 355 So.2d at 1383).
¶ 75. In its order denying Vickers's motion for a new trial, the trial court stated that:
The Court is well satisfied that both jurors [Wilson] and [Smith] under no circumstances withheld substantial information or misrepresented in any way material fact during the voir dire process, particularly in light of the juror questionnaire information forms provided to the [C]ourt and both counsel by each member of the jury panel including jurors [Wilson] and [Smith]. Both jurors [Wilson] and [Smith] testified at the Motion for A New Trial [hearing] that their respective verdicts were based strictly on the law and the evidence presented in the case. The Court had an opportunity to fully hear and consider their entire testimony and to observe their demeanor and is fully satisfied that both jurors were totally truthful and were fair and unbiased in rendering their verdict.
As to juror [Brown], his testimony revealed that he never had any conversation of any type with the witness, Charles Allen, related to the case-in-chief either before, during[,] or after the trial. His knowledge of Charles Allen was at best limited and the Court accepts juror [Brown's] testimony as truthful in all respects. Juror [Brown] also testified that his verdict was based strictly on the law and the evidence presented in the case.
¶ 76. The trial court did not make any on-the-record findings pursuant to Odom. However, it is clear from the trial court's order denying Vickers's motion for a new trial that it found no prejudice to Vickers resulted from the jurors's lack of response. Therefore, we can presume that it answered the preliminary questions required of Odom in the affirmative.
¶ 77. On review of the record before us, we concur with the trial court's resolution of the issue and find that no reasonable basis of prejudice can be inferred from the jurors's responses, or lack thereof. From the testimony of Jurors Smith and Wilson, it is clear that they were not attempting to hide their ultimate responses, or otherwise conceal some bias against Vickers or the charges against him. They simply misunderstood the question asked of them. As found by the trial court, their testimony during the closed hearing showed that no substantial or material information was withheld by either juror. This is particularly so given the jurors' responses on their juror questionnaire forms.
¶ 78. As to Juror Brown, we reach the same conclusion. Juror Brown testified that he and Allen never discussed any information regarding Vickers's trial. In fact, he stated that any contact with Allen would have been nothing more than an exchange of niceties. Finally, all three jurors testified that their verdict in Vickers's case was based solely upon the law as instructed by the trial court and the evidence and testimony presented at trial. This issue is without merit.

VI. WHETHER VICKERS'S ABILITY TO PRESENT A MEANINGFUL DEFENSE WAS HINDERED.
¶ 79. As with the majority of criminal trials, several issues concerning evidentiary matters arose during the course of Vickers's trial. Vickers argues that the trial court's rulings on many of these issues prevented him from mounting a meaningful defense. Specifically, Vickers claims that the trial court erred in failing to allow: (1) cross-examination of Brenda to show that Vickers would not have been entitled to David's estate; (2) impeachment *221 of Brenda's testimony through an alleged prior inconsistent statement given during an hypnosis session; (3) the defense to attempt to show that Brenda could have been behind David's murder; (4) cross-examination of investigators concerning why certain charges were not brought against Woodruff; (5) questioning relating to the civil suit over Elmer Vickers's estate; (6) cross-examination of Brenda concerning a wrongful death lawsuit filed against Vickers; and (7) questions concerning who was named executor to David's estate. Vickers argues the above testimony should have been allowed as the defense "was attempting to prove the State's motive for the murder, inheritance money, was faulty."
¶ 80. "The relevancy and admissibility of evidence are largely within the discretion of the trial court and this Court should only reverse where it is clear that discretion has been abused." Rubenstein v. State, 941 So.2d 735, 760(¶ 88) (Miss. 2006) (quoting Simmons v. State, 805 So.2d 452, 487-88(¶ 92) (Miss.2001)). With this standard in mind, we review each of Vickers's allegations of error.

A. CROSS-EXAMINATION OF BRENDA
¶ 81. Vickers first argues the trial court erred in not allowing his trial counsel to question Brenda, who he claimed was the executrix of David's estate, regarding Elmer Vickers's estate. Specifically, Vickers's trial counsel wanted to ask Brenda about certificates of deposit owned by Elmer Vickers that were allegedly payable on death to David and Vickers's son. Vickers's trial counsel claimed these certificates of deposit were all that was left of Elmer Vickers's estate, and he wanted to ask Brenda if she was aware that Vickers was not going to receive any money from the certificates of deposit and, ultimately, Elmer Vickers's estate. The State argued that was not an accurate representation of the then current proceedings concerning the estate.
¶ 82. The trial court denied Vickers's request to question Brenda concerning Elmer Vickers's estate as it assumed facts not in evidence, i.e., that the estate was insolvent. However, the trial court held that if the proper predicate was laid, this issue could be revisited with Brenda. As to the foundation for the solvency and specifics of the estate of Elmer Vickers, Bill Walker, who was the attorney involved with the litigation surrounding Elmer Vickers's estate, was subpoenaed by defense counsel. However, defense counsel declined the opportunity to call Walker to the stand. Therefore, Vickers was given the opportunity to bring this evidence before the jury, but chose not to. Such can hardly be identified as trial court error. This issue is without merit.

B. ATTEMPTED IMPEACHMENT OF BRENDA
¶ 83. During the investigation into the murder of David and assault on Brenda, law enforcement employed a hypnotist to jog Brenda's memory of the attack. Vickers argues that he should have been allowed to impeach Brenda with a prior inconsistent statement made during a hypnosis session. The trial court denied Vickers's request, stating that hypnosis was not a recognized field of science; and without the hypnotist there to testify to the validity of hypnotism and Brenda's actual state during the session, questions concerning statements made during the session would not be allowed.
¶ 84. In House v. State, 445 So.2d 815 (Miss.1984), the supreme court analyzed the usefulness, admissibility, and reliability of the testimony of a witness in a criminal prosecution "regarding matters explored *222 during [a] hypnotic experience." House, 445 So.2d at 818-27. At the conclusion of the supreme court's analysis, it held that such testimony was not per se inadmissible; however, the supreme court held that the trial court must satisfy itself that certain "safeguards" were met prior to allowing the witness to testify.[3]Id. at 826. These safeguards were deemed necessary as a result of the suggestion:
that hypnosis is a state of heightened suggestibility and altered consciousness, that distortions of reality, false memories, fantasies and confabulation are likely to result, and that often, following the hypnotic experience, the witness has difficulty distinguishing between what he or she knew before the hypnotic experience and what may have been "suggested" during the hypnotic experience.
Id. at 823. However, the supreme court's concern in House was the admissibility of such testimony as substantive evidence. Its use for impeachment purposes was not explored.
¶ 85. In this case, defense counsel sought to impeach Brenda by playing the tape of her hypnotic session in which she gave a description of the assailant who murdered David and attacked her, as well as a description of the car used. Indeed, if she had given testimony differing from her prior descriptions then defense counsel would have had the prerogative of impeaching her by confronting her with her prior inconsistent statements. M.R.E. 613(b). Furthermore, "a witness'[s] testimony that she does not remember giving a prior statement may be impeached by questioning about the statement." Hansen v. State, 592 So.2d 114, 133 (Miss. 1991). However, in order to preserve the claim that the trial court erred in precluding defense counsel from impeaching Brenda with the taped statements, defense counsel was required to make a proffer showing that the taped statements were admissible at all under rule 613(b). M.R.E. 103(a)(2). Without such a showing in the record, we must affirm the trial court's ruling. This issue is without merit.
¶ 86. Furthermore, Rule 613(b) requires that the witness be given an opportunity to explain or deny extrinsic evidence of a prior inconsistent statement before it is admitted into evidence. Given the unsure nature of the effect of hypnotism in general, and the supreme court's caution with its admissibility as substantive evidence, the declarant's ability to explain or deny the statement may be beyond them. However, we are not required to review such a possibility today in order to resolve this issue.

C. ATTEMPT TO SHOW BRENDA WAS BEHIND DAVID'S MURDER
¶ 87. Prior to trial, the State submitted a motion in limine seeking to prohibit Vickers's defense counsel from suggesting Brenda as a possible suspect in David's murder. Defense counsel argued that he intended to ask Investigator McKenzie if the first person Woodruff claimed hired him to kill David was Brenda. The trial court granted the State's motion, holding that Investigator McKenzie testifying as to what Woodruff said was hearsay.
¶ 88. "`Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." M.R.E. 801. Defense counsel *223 claimed the statement was not being offered to prove Brenda hired Woodruff to kill David. However, when asked by the trial court to state another purpose for eliciting Woodruff's statement from Investigator McKenzie, defense counsel could state none. Therefore, the statement sought from Investigator McKenzie was clearly hearsay, and the trial court did not abuse its discretion in excluding it. Additionally, notwithstanding defense counsel's argument, during the direct examination of Woodruff, Woodruff testified that he first told Investigator McKenzie that Brenda hired him to kill David. This issue is without merit.

D. QUESTIONING INVESTIGATOR MCKENZIE AS TO WHY CHARGES WERE NOT BROUGHT AGAINST WOODRUFF
¶ 89. Vickers next argues that the trial court precluded defense counsel from cross-examining Investigator McKenzie as to why firearm charges were not pursued against Woodruff. However, our review of the record reveals that defense counsel was not prohibited from asking any substantive question. Additionally, the transcript does not reveal that defense counsel was asking Investigator McKenzie why firearm charges were not brought against Woodruff, but whether Woodruff was seen with a firearm. Lastly, in addition to the fact that defense counsel was not prohibited from questioning Investigator McKenzie on this issue, Investigator McKenzie did not have the discretion to choose which charges, if any, would be brought against Woodruff. A prosecutor is afforded broad discretion in deciding what charges, if any, to bring in a criminal trial. Watts v. State, 717 So.2d 314, 320(¶ 14) (Miss.1998). It was simply not Investigator McKenzie's decision to make. This issue is without merit.

E. QUESTIONS REGARDING THE CIVIL SUIT OVER ELMER VICKERS'S ESTATE
¶ 90. Vickers again argues that the trial court erred when it prohibited defense counsel from inquiring about the lawsuit surrounding Elmer Vickers's estate while cross-examining Hancock, a long-time employee of Elmer Vickers. The following questioning took place between defense counsel and Hancock:
Q. And Ms. Hancock you're aware that on July 31 of 2000, the day this fight happened, was the day that a lawsuit was filed to place Elmer Vickers under conservatorship?
A. I don't know that to be the date. All I know, it was around that time.
Q. It was around that time. And are you aware that David is the one that filed this suit to have his father declared incompetent?
PROSECUTOR: Your Honor, this is not proper cross-examination unless these is some connection between the two. First of all, there is no evidence in here, he hasn't established that, she doesn't know anything about that.
TRIAL COURT: All right. Can you lay a predicate, Counsel?
Q. Ms. Hancock, are you a notary public?
A. Yes, I am.
Q. Did you notarize paperwork dealing with this conservatorship?
A. In what way are you speaking of?
Q. Well, affidavits, things being filed in the case, were you the notary on those documents?
A. No, I did not. I notarized the general power of attorney.
Q. And when did you do that; do you recall?

*224 A. No, sir, I don't know the date.
Q. And that was a general power of attorney for David?
A. No, sir, James Vickers, junior.
Q. To give Elmer Vickers'[s] grandson power of attorney?
A. Correct.
Q. Now, you said you remembered the lawsuit being filed about this time; is that correct?
A. That's correct.
Q. And you know that Jimmy was angry about that?
A. Yes.
Q. That's all I have, Your Honor.
Reviewing the portion of the record cited as pertinent to this issue, quoted above, it is clear that defense counsel was not at all prohibited from questioning Hancock. This issue is without merit.

F. QUESTIONS CONCERNING A WRONGFUL DEATH SUIT FILED BY BRENDA
¶ 91. Vickers argues that "the [trial] court did not allow Brenda to be cross-examined about a wrongful death lawsuit she filed against Vickers." However, notwithstanding the dubious relevancy of such information, the record reveals that the trial court ruled that defense counsel could ask Brenda if she filed a wrongful death suit against Vickers. However, prior to defense counsel asking Brenda of the civil suit, the State voiced another objection, which was the subject of Issue VI(A) above. When cross-examination of Brenda resumed, defense counsel did, in fact, ask Brenda whether she filed a wrongful death suit against Vickers. This issue is without merit.

G. QUESTIONING A WITNESS AS TO WHO WAS THE EXECUTOR OF DAVID'S ESTATE
¶ 92. Vickers's final evidentiary point of error is that the trial court erred in prohibiting defense counsel from asking Nick Johnson, a personal friend of David, whether he knew who was the executor of David's estate. The record reveals that the State did object when defense counsel asked Johnson the question in issue. However, prior to the trial court ruling on the State's objection, defense counsel withdrew the question. As was the case with several of the above evidentiary issues, there can be no trial court error when the trial court is not given the opportunity to err. This issue is without merit.

VII. WHETHER THE DOCTRINE OF CUMULATIVE ERROR WARRANTS A NEW TRIAL.
¶ 93. "The cumulative error doctrine stems from the doctrine of harmless error ... [which] holds that individual errors, which are not reversible in themselves, may combine with other errors to make up reversible error, where the cumulative effect of all errors deprives the defendant of a fundamentally fair trial." Ross v. State, 954 So.2d 968, 1018 (¶ 138) (Miss.2007). However, where there is no error in part, there can be no reversible error to the whole. Gibson v. State, 731 So.2d 1087, 1098(¶ 31) (Miss.1998) (citing McFee v. State, 511 So.2d 130, 136 (Miss. 1987)). In this case, there were no errors committed by the trial court, harmless or not, that would warrant reversal. This issue is without merit.
¶ 94. THE JUDGMENT OF THE CIRCUIT COURT OF WASHINGTON COUNTY OF CONVICTION OF COUNT I CAPITAL MURDER AND SENTENCE OF LIFE WITHOUT THE POSSIBILITY OF PAROLE; AND COUNT II AGGRAVATED ASSAULT AND SENTENCE OF TWENTY YEARS TO RUN CONSECUTIVELY TO THE *225 SENTENCE IN COUNT I; AND COUNT III CONSPIRACY TO COMMIT CAPITAL MURDER AND SENTENCE OF TWENTY YEARS TO RUN CONSECUTIVELY TO THE SENTENCE IN COUNT I AND CONCURRENTLY TO THE SENTENCE IN COUNT II; AND COUNT IV CONSPIRACY TO COMMIT CAPITAL MURDER AND SENTENCE OF TWENTY YEARS TO RUN CONSECUTIVELY TO COUNT I AND CONCURRENTLY TO COUNTS II AND III; AND COUNT VI POSSESSION OF A FIREARM BY A CONVICTED FELON AND SENTENCE OF THREE YEARS TO RUN CONSECUTIVELY WITH COUNT I AND CONCURRENTLY WITH COUNTS II, III, AND IV, ALL IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO WASHINGTON COUNTY.
KING, C.J., LEE AND MYERS, P.JJ., IRVING, CHANDLER, GRIFFIS AND ISHEE, JJ., CONCUR. BARNES, J., CONCURS IN PART AND IN RESULT WITHOUT SEPARATE WRITTEN OPINION. CARLTON, J., NOT PARTICIPATING.
NOTES
[1] The testimony revealed that it was a common occurrence for individuals to stop at the Vickerses' residence to pick up pecans from their yard.
[2] As the transcript of the post-trial hearing was sealed, the jurors's names have been changed to protect the integrity of the record.
[3] We note that under House such a determination would have been appropriate prior to allowing Brenda to testify at all; however, no objection was voiced by defense counsel concerning her testimony. Therefore, whether the "safeguards" were met is moot. Thibodeaux v. State, 652 So.2d 153, 170 (Miss. 1995).