# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2023-KA-00178-COA

**GREGORY DAVIS A/K/A GREGORY ANTONIO DAVIS A/K/A GD**　　　　　　　　**APPELLANT**

**v.**

**STATE OF MISSISSIPPI**　　　　　　　　　　　　　　　　　**APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 02/03/2023 |
| TRIAL JUDGE: | HON. JAMES T. KITCHENS JR. |
| COURT FROM WHICH APPEALED: | OKTIBBEHA COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: MOLLIE MARIE McMILLIN |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: ABBIE EASON KOONCE |
| DISTRICT ATTORNEY: | SCOTT WINSTON COLOM |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 01/14/2025 |
| MOTION FOR REHEARING FILED: | |

### BEFORE CARLTON, P.J., McDONALD AND McCARTY, JJ.

### CARLTON, P.J., FOR THE COURT:

¶1. An Oktibbeha County Circuit Court jury convicted Gregory Davis of one count of aggravated assault with a weapon against Eric Bishop and one count of possession of a weapon by a felon. The trial court sentenced Davis to serve twenty years for aggravated assault and ten years for the felon-in-possession conviction in the custody of the Mississippi Department of Corrections, with the sentences set to run consecutively. The trial court denied Davis's post-trial motion for judgment notwithstanding the verdict or for a new trial.

¶2. On appeal, Davis asserts one issue. According to Davis, "[t]he trial court erred in excluding evidence of a witness's prior convictions for forgery in violation of his [(Davis's)]

right to fully cross-examine witnesses against him." For the reasons addressed below, we find that Davis's assignment of error is without merit. Accordingly, we affirm Davis's convictions and sentences.

**STATEMENT OF FACTS RELEVANT TO THE ISSUE ON APPEAL**

¶3. Davis's trial began on January 31, 2023.[1] At trial, Bishop testified that Davis had been his friend, but for several months Davis had been accusing him of stealing his money. One afternoon Davis was standing outside a local café when Bishop and Quartez Williams pulled into the parking lot in Williams's truck. Williams was driving. Davis approached the truck, demanding his money from Bishop, and then Davis pulled a gun on Bishop.

¶4. Bishop said that after a short struggle, Davis shot him twice—once in the arm and once in the side. Williams testified that when Davis pulled out the gun,[2] he (Williams) got out of his truck and ran toward a nearby pasture. As he ran, he heard two gunshots. When Williams returned to the café parking lot, he found Bishop bleeding from gunshot wounds. Brandi Gazaway was also at the café. She testified that she saw Davis and Bishop arguing about "money." She left the area and "went down the road." She returned, and at that point, she saw that Bishop had been shot and was bleeding.

¶5. Davis's relative Quinton Bell told the jury that Davis came to his house with a gun before the shooting. Davis was upset because he thought several people had been stealing

---

[1] The State presented the testimony of eleven witnesses at trial. The testimonies of some of these witnesses are not relevant to the issue Davis raises on appeal or the manner in which we resolve the issue. As such, we find that a lengthy discussion of their testimonies is not necessary.

[2] Williams identified the gun as a black, long-barrel gun.

from him, including two women whom both of them knew. According to Bell, Davis was so upset he said he was going to kill one of the women (Laura). Davis then told Bell, "[T]hat N-word, EB,[3] is go [sic] give me my money, too." Bell said that he gave Davis $200 in an effort to calm him down. Bell then left his house to run an errand. When he returned, Davis was gone.

¶6. A few hours later, Davis called Bell and told him that his vehicle had broken down and asked for a ride. Davis got a ride to Bell's house and told Bell that he "shot that n*****." According to Bell, Davis said that Bishop pulled a knife on him and tried to cut him, so he had to shoot Bishop. Other than Bell's testimony about what Davis told him about Bishop having a knife, there was no other testimony or evidence at trial that Bishop had a knife or any other weapon.

¶7. Bell testified that he later went to repair and retrieve Davis's vehicle from the side of Highway 82. While repairing the vehicle on the side of the road, Deputy Phillip Miller from the Oktibbeha County Sheriff's Department stopped to question Bell regarding the alleged shooting. Deputy Miller took Bell's statement and then permitted him to leave. At trial, Deputy Miller testified that Bell told him that he saw Davis twice that day, "earlier that morning and after the incident that afternoon." During his cross-examination, Bell explained that the deputies "asked me some questions and I just answered." He did not volunteer that Davis had told him earlier that day that he wanted to kill Laura because "[the officers

---

[3] Bell explained that "EB" refers to Eric Bishop.

already] knew that [Davis] had done shot . . . Bishop."[4]

¶8.     On cross-examination, Davis's counsel attempted to question Bell about two 1995 prior forgery convictions, for which he received six- and seven-year sentences (the "stale" forgery convictions).  *See* MRE 609(b).[5]  The State objected, and the trial court held a hearing on the issue outside the presence of the jury.  The State argued that Davis should not be permitted to question Bell about the convictions because they were outside the ten-year window set forth under Mississippi Rule of Evidence 609(b), which limits the use of such convictions unless the conditions delineated in the rule are met.  MRE 609(b)(1)-(2).  Davis's counsel, however, argued that the convictions involved dishonesty, so the ten-year limitation did not apply.  After hearing the parties' arguments, the trial court denied Davis's request to use the stale forgery convictions.  Further details regarding the trial court's ruling are discussed below.

¶9.     After presenting its witnesses, the State rested.

¶10.    Davis did not testify on his own behalf, and the defense did not present any witnesses.

¶11.    The jury found Davis guilty of both counts against him.  The trial court sentenced

---

[4] It is unclear from the record whether law enforcement actually had Davis in custody at this point.

[5] The prosecutor explained to the trial court that Bell was first convicted of uttering a forgery on January 24, 1995, and he was sentenced to serve six years in custody. He then had a second conviction for uttering a forgery on June 1, 1995, and he was sentenced to serve seven years. There was no information before the trial court regarding how long Bell served for either conviction.  Rule 609(b)'s ten-year limitation on the use of convictions "applies if more than 10 years have passed since the witness's conviction or release from confinement for it, whichever is later," so even if Bell served his sentences in full, his "release from confinement" would have been twenty-one years before the January 2023 trial.

Davis as set forth above. After the trial court denied his post-trial motion, Davis appealed, arguing that "[t]he trial court erred in excluding evidence of a witness's prior convictions for forgery in violation of his [(Davis's)] right to fully cross-examine witnesses against him."

## STANDARD OF REVIEW

¶12.  "We review a trial court's decision to admit or exclude evidence for abuse of discretion," including a prior conviction for impeachment purposes. *Ross v. State*, 308 So. 3d 885, 889 (¶10) (Miss. Ct. App. 2020). "The relevancy and admissibility of evidence are well within the trial court's discretion, and reversal may be had only where that discretion has been abused." *Id.*

## DISCUSSION

¶13.  Davis asserts that the trial court erred in excluding Bell's 1995 forgery convictions that, according to Davis, resulted in an impairment of "[his] Sixth Amendment right to cross-examine the witness."[6] We are not persuaded by Davis's assertions in support of this contention. We find no abuse of discretion or error in the trial court's ruling excluding Bell's stale forgery convictions for the reasons addressed below.

¶14.  Mississippi Rule of Evidence 609(b) limits the use of a prior conviction for impeachment purposes "if more than 10 years have passed since the witness's conviction or release from confinement for it, whichever is later." MRE 609(b). The rule then delineates the limitations on the use of such evidence as follows:

---

[6] The Confrontation Clause of the Sixth Amendment of the United States Constitution provides: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI; *accord* Miss. Const. art. 3, § 26.

5

Evidence of the conviction is admissible *only if*:

> (1) its probative value, *supported by specific facts and circumstances*, substantially outweighs its prejudicial effect; and

> (2) the proponent gives an adverse party reasonable written notice of the intent to use it so that the party has a fair opportunity to contest its use.

MRE 609(b) (emphasis added).

¶15. As explained above, taking into account the time Bell served with respect to these forgery convictions, they were at least twenty-one years old as of the January 2023 trial. The admissibility of these convictions, therefore, was subject to the limitations set forth in Rule 609(b).

## I. Davis's Right to Confront the Witness

¶16. This Court analyzed a nearly identical Rule 609(b) admissibility issue as the issue before us in *Vickers v. State*, 994 So. 2d 200, 216-18 (¶¶59-69) (Miss. Ct. App. 2008). In *Vickers*, the defendant Vickers was convicted on five counts, including capital murder and aggravated assault involving his brother and sister-in-law. *Id.* at 205 (¶1). During the cross-examination of a State witness, Vickers's counsel sought to impeach the witness using a twenty-six-year-old burglary conviction and fourteen other arrests. *Id.* at 216 (¶59). He argued that he offered the conviction to show that the witness moonlit as a state informant. *Id.* The trial court excluded the conviction because "the probative value of disclosure of the conviction was not supported by specific facts." *Id.*

¶17. On appeal, Vickers argued that the trial court erred in excluding the conviction. *Id.* at (¶60). This Court disagreed and affirmed the trial court's ruling. *Id.* at 218 (¶69). The

6

*Vickers* Court began its analysis by distinguishing *White v. State*, 785 So. 2d 1059 (Miss. 2001), a case in which the Mississippi Supreme Court, on certiorari, found reversible error based upon a trial court's denial of the defendant's request to cross-examine the State's key witness about his prior drug conviction. *Id.* at 216-17 (¶¶61-63); *see White*, 785 So. 2d at 1062-63 at (¶¶7-13). The supreme court found the trial court's ruling violated White's constitutional right to confront witnesses testifying against him. *White*, 785 So. 2d at 1060 (¶1).

¶18. White was convicted of three counts of selling crystal methamphetamine. *Id.* At trial, the court denied White's motion to cross-examine the State's confidential informant witness (Shedd) about his felony drug conviction, finding it did not relate to the witness's veracity. *Id.* at (¶3). This Court affirmed White's convictions on appeal. *Id.* at (¶1). On certiorari, however, the supreme court reversed White's convictions and granted a new trial, noting that Shedd was the State's "key witness." *Id.* at 1063 (¶11). As such, the supreme court found that White's "constitutional right to confront [the State's key witness] testifying against him [had been] violated." *Id.* at 1060 (¶1).

¶19. In reaching this conclusion, the supreme court observed that "[a] criminal defendant is afforded greater protection than the prosecution via the . . . Confrontation Clause of the Sixth Amendment of the United States Constitution" and the "almost identical provision" under Article 3, Section 26 of the Mississippi Constitution. *Id.* at 1062 (¶9). Thus, "[g]iven the constitutional right of a criminal defendant to confront those testifying against him, we interpret [Mississippi Rule of Evidence] 609(a)(1) as allowing full impeachment of

prosecution witnesses without the requirement of a balancing test, except in extreme situations [not applicable to this case]." *Id.*

¶20.    In *Vickers*, although the prior conviction at issue there was subject to the limitations set forth in Rule 609(b), the Court began its analysis by recognizing the principle announced in *White*: "The supreme court has held that . . . non-party witnesses for the State may be impeached under Rule 609(a)(1) without balancing the probative value of the evidence with its prejudicial effect." *Vickers*, 994 So. 2d at 216 (¶61) (citing *White*, 785 So. 2d at 1062 (¶10)).

¶21.    However, the Court then distinguished Vickers's case from the facts in *White*, pointing out that in *White*, Shedd was the State's "chief witness," who had purchased crystal methamphetamine from the defendant on several occasions as a confidential informant for law enforcement. *Id.* at 216-17 (¶62) (citing *White*, 785 So. 2d at 1063 (¶12)). In contrast, the Court found that the witness in Vickers's case "was far from the State's chief witness." *Id.* at 217 (¶63). Although the witness testified about "another attempt by Vickers to hire someone to murder his brother and sister-in-law," the Count pointed out that "his testimony did not directly contribute to the validity or doubt of any of the State's charges against Vickers." *Id.*

¶22.    Since *Vickers* and *White* were decided, the supreme court has also found reversible error on certiorari review where this Court, citing the time limitations under Rule 609(b), affirmed a trial court's refusal to allow the defense to cross-examine the State's confidential informant witness about a seventeen-year-old criminal conviction. *Anthony v. State*, 108 So.

8

3d 394, 397 (¶4) (Miss. 2013). The witness in *Anthony* had been arrested for other charges and was "'working off' these charges as a confidential informant." *Id.* at (¶3).

¶23. Citing the confrontation clauses of the federal and state constitutions, the supreme court found that excluding this information was in error because "the favorable treatment [the informant] received on his prior charges in exchange for his testimony was a material point that affected [the informant's] credibility as a witness." *Id.* at 398 (¶7). As it did with respect to the witness's testimony in *White*, the supreme court emphasized the crucial nature of the State witness's testimony. *Id.* The supreme court observed that "the State's case relied heavily on [the informant's] testimony" regarding the cocaine sale at issue; "[t]hus[,] the reliability of [the informant's] testimony was crucial." *Id.* Under these circumstances, the supreme court found that "[the defendant's] jury should have heard the full extent of the deals between [the informant] and the State." *Id.*

¶24. In the case before us, we find that the facts in both *White* and *Anthony* are distinguishable, and we find guidance from this Court's analysis in *Vickers*. First, like the witness in *Vickers* (and unlike the State's key witness in *White* or *Anthony*), Bell was by no means the State's chief witness or a crucial witness in this case, *cf. White*, 785 So. 2d at 1063 (¶12); *Anthony*, 108 So. 3d at 398 (¶7), nor was there any indication that Bell had received any "favorable treatment" on his decades-old forgery convictions in exchange for his testimony at Davis's trial. *Cf. Anthony*, 108 So. 3d at 398 (¶7).

¶25. On the contrary, in the case before us, the State's chief witness was the victim—Bishop. Bishop testified about going to the café with his friend, Williams, where

9

Bishop was shot. Bishop saw Davis upon arriving at the café. Bishop further testified that when Williams parked, Davis approached the car and began asking Bishop about the money he [(Bishop)] supposedly owed him. Bishop told the jury that Davis pulled a gun on him, and they both fought over it. Bishop was unable to get the gun from Davis, and Davis shot at him three times, missing once and then striking him in the arm and the side.

¶26. Two other witnesses who testified at trial were present at the shooting. Williams testified that Davis approached Bishop before Bishop could exit the truck. Williams told the jury that he saw Davis pull a gun on Bishop; Williams then ran away. Williams also identified the gun. As he ran, Williams heard two gunshots and returned to see Bishop bleeding from gunshot wounds. Gazaway testified that she saw Bishop and Davis arguing and later saw Bishop in the café parking lot after Davis shot him.

¶27. In comparison, Bell did not witness the shooting. He only testified about his conversation with Davis before and after the shooting took place and about seeing the gun used in the shooting. We find that these circumstances do not warrant reversing the trial court's exclusion of Bell's stale forgery convictions based upon Bell's tangential contribution to the State's charges against Davis. *See Vickers*, 994 So. 2d at 217 (¶63).

## II. Exclusion Pursuant to MRE 609(b)(1)

¶28. This Court in *Vickers* also relied on Rule 609(b) in affirming the trial court's exclusion of the State witness's stale conviction. We noted the "antiquated" nature of the witness's prior conviction and observed that "[Rule] 609(b) excludes the use of evidence of a conviction for impeachment purposes if the conviction is greater than ten years old." *Id.*

10

at 217 (¶64) (quoting MRE 609(b)). In this regard, we recognized that "[e]vidence of such a conviction should not be admitted unless the trial court determines 'that the probative value of the conviction is supported by . . . specific facts and circumstances [which] substantially [outweigh] its prejudicial effect.'" *Id.* (quoting MRE 609(b)). Elaborating, this Court explained that under this test, "the proponent of using the antiquated conviction for impeachment purposes must *first* demonstrate the probative value of the conviction by showing how the conviction suggests the witness is less than credible." *Id.* (brackets and internal quotation marks omitted) (emphasis added). "Failing such a showing by the proponent, a trial court's ruling to exclude evidence of a stale conviction will be upheld." *Id.* (quoting *Jones v. State*, 776 So. 2d 643, 651 (¶28) (Miss. 2000)).

¶29. Applying these principles, this Court noted that the trial court had asked Vickers's counsel to explain why the conviction should be admitted. *Id.* at 217 (¶65). Counsel merely submitted that it went to the witness's credibility and would show that he had been working for the State as an informant. *Id.* We upheld the trial court's exclusion of the conviction because Vickers failed to show the probative value was supported by specific facts and circumstances. *Id.* In particular, this Court found that Vickers presented "no evidence . . . whatsoever that supported defense counsel's allegation that [the witness] was an informant. Accordingly, Vickers failed to make a prima facie showing of the probative value of the burglary conviction. Therefore, the trial court did not err in excluding it." *Id.*

¶30. Like the witness's conviction in *Vickers*, Bell's stale forgery convictions were subject to the time limitations of Rule 609(b). And like the trial court in the case before us, we find

11

that Davis failed to meet the threshold burden of demonstrating, "by specific facts and circumstances," MRE 609(b)(1), the probative value of the stale forgery convictions. *See Vickers*, 994 So. 2d at 217 (¶64).

¶31. On appeal, Davis contends that the trial court erred in excluding the convictions because his counsel sought to question Bell about the stale forgeries "to cast doubt on the truthfulness of Bell's testimony . . . that Davis had come to his home [the morning before the shooting] talking about killing somebody." But as the trial court found, Davis wholly failed to develop any testimony or present any evidence that demonstrated this proposed strategy.

¶32. At trial, Bell testified that Davis came to his house on the morning of the shooting with a gun and was angry because he thought several people had been stealing from him, including a woman named Laura. Bell said Davis was so upset he said he was going to kill Laura. Later, during cross-examination, Davis's counsel asked Bell whether he had told the deputies during questioning about what Davis had said (about wanting to kill Laura). Bell answered frankly, "Well, no, I didn't, because they [the deputies] already knew what had went on. I mean, they told me that [Davis]—obviously, everybody knew [Davis] had done shot . . . Bishop . . . . They asked me some questions, and I just answered." Davis's counsel then attempted to impeach Bell with the stale forgery convictions. The State objected pursuant to Rule 609(b), and the trial court held a hearing outside the presence of the jury.[7]

---

[7] Although the State knew about the forgery convictions, it did not know that Davis's counsel intended to question Bell about them during his cross-examination. The State, however, did not specifically object to Davis's failure to provide the notice required by Rule 609(b)(2). In the course of the hearing, the trial judge noted that Davis had not provided written notice (or any notice) to the State that he intended to use the stale forgeries. The trial court admonished Davis's counsel for failing to give notice and advised him that "in the

12

¶33. Regarding the probative value of the convictions, the trial judge asked Davis's counsel to make "any argument that [he] had for why [these stale convictions] should come in when [they] were from 1995. . . . So, here's your best shot. Tell me why these convictions from 1995 for uttering forgery come in[?]" Counsel responded, "Judge, I think that the . . . witness's credibility is the issue in this case. . . . [W]e are contending that there are multiple stories about what took place." The trial judge found, however, that this issue was not before the court, or the jury, based upon any questioning that had taken place so far. Concerning Bell's questioning by the deputies, the trial judge found that Bell's testimony was merely that he did not tell the deputies about Davis's statement because they did not ask him and because they had already told Bell that they knew Davis had shot Bishop. In the trial judge's view, this testimony was not indicative of Bell's truthfulness (or lack thereof).

¶34. In short, the trial judge found that Bell simply answered the questions put to him. As the trial judge noted, "[Bell] may have told two different statements to officers, but I haven't heard them yet." As such, the trial judge denied Davis's motion to question Bell about the stale forgeries at that point. The trial judge told Davis's counsel however, "Now, that doesn't

---

future," he should provide notice to the adverse party and request a hearing on the issue. The trial court then allowed Davis's counsel to proceed and address any argument he had about why he should be able to question Bell about the stale forgery convictions. The trial court's ultimate ruling excluding the stale forgery convictions was not based upon Davis's failure to give the State written notice that he intended to use them.

On appeal, the State asserts that the trial court's ruling should also be affirmed because Davis failed to provide it with the appropriate notice as required by Rule 609(b)(2). Under these particular circumstances, however, we decline to address the notice issue because the State did not assert this objection at trial, nor was the trial court's ruling based upon Davis's failure to provide the Rule 609(b)(2) notice. *See Hobgood v. State*, 926 So. 2d 847, 855 (¶27) (Miss. 2006).

mean I'm not going to let you bring up a conviction that old. If you can show me why [Bell's] just being outright dishonest. But I think his explanation sort of makes sense."[8]

¶35. When the trial resumed and Davis's counsel continued Bell's cross-examination, however, counsel did not make any discernible attempt to show purported inconsistencies in Bell's testimony. He tendered the witness without renewing his motion.

¶36. Under these circumstances, we find no abuse of discretion in the trial court's ruling excluding the stale forgery convictions. As we recognized in *Vickers*, if a party seeks to use an "antiquated conviction for impeachment purposes [he] must *first* demonstrate the probative value of the conviction by showing how the conviction suggests the witness is less than credible." *Vickers*, 994 So. 2d at 217 (¶64) (emphasis added) (internal quotation marks omitted). If that party fails to do so, then "a trial court's ruling to exclude evidence of a stale conviction will be upheld." *Id.*; *see also Ross v. State*, 22 So. 3d 400, 410 (¶32) (Miss. Ct. App. 2009) (affirming the trial court's ruling excluding a State witness's stale conviction to impeach the witness where the defense failed to show its probative value), *overruled on other*

---

[8] We recognize that the trial judge addressed the factors set forth in *Peterson v. State*, 518 So. 2d 632, 636 (Miss. 1987), in the course of issuing his ruling. "The *Peterson* factors include: (1) the impeachment value of the prior crime; (2) the [age] of the conviction . . . and the witness's subsequent history; (3) the similarity between the past crime and the charged crime; (4) the importance of the defendant's testimony; and (5) the centrality of the credibility issue." *Burgess v. State*, 210 So. 3d 569, 575 (¶17) (Miss. Ct. App. 2016). As Davis points out, these factors apply only when assessing the admissibility of a party's prior convictions for impeachment purposes. *See* MRE 609 advisory committee note ("[C]onvictions offered under 609(a)(1) to impeach a party must be analyzed under the guidelines set forth in *Peterson*."). We find that any purported error in the trial court noting these factors, however, is harmless. As we have addressed above, the trial judge specifically found that Davis failed to even meet his threshold burden of *first* demonstrating the probative value of Bell's prior forgery convictions. *See Vickers*, 994 So. 2d at 217 (¶64).

*grounds by Portis v. State*, 245 So. 3d 457, 470 (¶30) & n.10 (Miss. 2018). Because Davis's counsel failed to make any such showing here, we find no error in the trial court's ruling excluding Bell's stale forgery convictions. *See Vickers*, 994 So. 2d at 217 (¶65) ("[Because] Vickers failed to make a prima facie showing of the probative value of the burglary conviction . . . the trial court did not err in excluding it.").

¶37. Nevertheless, Davis insists that the trial court erred in excluding the stale forgery convictions because their probative value "substantially outweighs [their] prejudicial effect because any prejudice to Bell as a non-party witness is irrelevant." There is no need to address this issue. Upon review, we find no indication in the record that the trial judge even engaged in a probative versus prejudicial effect analysis. Instead—as we have discussed—given what the trial judge had before him when Davis's counsel first sought to use the stale forgery convictions, the trial judge found that "the uttering forgeries from 1995" were not "probative at this point in time." And, as we have also discussed above, although the trial judge specifically told Davis's counsel that he would revisit the issue if counsel could show him how Bell "was just being outright dishonest," Davis's counsel did not do so when he resumed Bell's cross-examination, nor did counsel renew the motion to use the stale forgery convictions. Accordingly, we find no error, and certainly no abuse of discretion, in the trial court's ruling excluding Bell's stale forgery convictions.

### III. Harmless Error

¶38. In any event, even if the trial court erred in excluding the stale forgery convictions, we find it was harmless error. An error is considered harmless and does not constitute

15

grounds for reversal "when it is apparent on the face of the record that a fair[-]minded jury could have arrived at no verdict other than that of guilty." *Young v. State*, 981 So. 2d 308, 313 (¶17) (Miss. Ct. App. 2007); *see Williams v. State*, 819 So. 2d 532, 541 (¶28) (Miss. Ct. App. 2001) (applying harmless-error analysis in Rule 609 context).

¶39.   Multiple witnesses testified about the shooting. Bishop—the victim—testified that Davis shot him. Williams testified about Davis approaching Bishop, demanding money, and pulling a gun on Davis. Williams ran from the scene at that point, but he testified that he heard gunshots, and upon returning to the café parking lot, he found Bishop shot and bleeding. Gazaway also testified that she heard Davis and Bishop arguing about money. She left for a brief time. When she returned to the café parking lot, she saw that Bishop had been shot. Additionally, three other witnesses (Bishop's cousin, a first responder to the scene who initially treated Bishop's wounds, and the physician who treated Bishop at the hospital) testified that Bishop told him or her that Davis had shot him.

¶40.   Thus, we find harmless error in this case in light of the overwhelming weight of evidence that the State presented establishing Davis's guilt beyond a reasonable doubt. We find no reasonable scenario in which knowing of Bell's stale forgery convictions could have affected the verdict of a fair-minded jury.

## CONCLUSION

¶41.   For all the reasons addressed above, we find no abuse of discretion or error in the trial court's ruling denying Davis's request to cross-examine Bell about his two prior forgery convictions that were over two decades old. Accordingly, we affirm Davis's convictions and

16

sentences.

¶42.    **AFFIRMED.**

**BARNES, C.J., WILSON, P.J., WESTBROOKS, McDONALD, LAWRENCE, McCARTY, EMFINGER AND WEDDLE, JJ., CONCUR.  ST. PÉ, J., NOT PARTICIPATING.**